**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JESSICA MAE PETHO, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 12-1312 |
| | ) | |
| v. | ) | Judge Cathy Bissoon |
| | ) | Magistrate Judge Maureen P. Kelly |
| CAROLYN W. COLVIN, | ) | |
| Commissioner of Social Security, | ) | Re: ECF Nos. 11, 13 |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

## I. RECOMMENDATION

It is respectfully recommended that the Court grant, in part, and deny, in part, Plaintiff's Motion for Summary Judgment (ECF No. 11), deny Defendant's Motion for Summary Judgment (ECF No. 13), and vacate the decision of the administrative law judge ("ALJ").

## II. REPORT

### A. BACKGROUND

#### 1. Procedural History

Jessica Mae Petho ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 – 433, 1381 – 1383f (the "Act").  Plaintiff filed for benefits claiming an inability

to work due to disability beginning March 7, 2008. (R. at 180 – 84, 199).[1] Plaintiff's alleged disabling impairments included cervical and lumbar strain, post-traumatic stress disorder ("PTSD"), and depression. (R. at 204). Plaintiff has exhausted all administrative remedies. (R. at 1 – 6, 9 – 31, 114 – 23). This matter now comes before this Court on cross motions for summary judgment. (ECF Nos. 11, 13).

## 2. Personal Background

Plaintiff was born on December 2, 1983, and was twenty-five years of age at the time of her application for benefits. (R. at 199). Plaintiff graduated from high school, and pursued post-secondary education in social work at a community college. (R. at 34, 43). She was only a few credits short of earning a degree, but withdrew from school. (R. at 43). Plaintiff's work history included employment as a cashier and in food service/preparation. (R. at 36, 204). She last worked on a part-time basis in December 2009. (R. at 35). Plaintiff resided in her own home with her daughter, for whom she was the primary caregiver. (R. at 211 – 17). She also had a boyfriend. (R. at 41).

## 3. Treatment History

On March 7, 2008, Plaintiff was involved in a head-on automobile collision. (R. at 231 – 40). She was treated in the emergency department at UPMC Mercy Hospital in Pittsburgh, Pennsylvania. (R. at 231 – 40). Plaintiff complained of a slight headache, but denied striking her head, losing consciousness, or experiencing pain, weakness, tingling, or impaired vision. (R. at 231). A physical examination and diagnostic testing revealed no significant abnormalities. (R. at 231 – 32, 237 – 40). As a result of the crash, it was determined that she had suffered a

---

[1]     Citations to ECF Nos. 7 – 7-16, the Record, *hereinafter*, "R. at __."

chest contusion and a left hip contusion.  (R. at 232).  Plaintiff was released from the hospital that same day.  (R. at 232).

Plaintiff's primary care physician was Marcia Nisenbaum, M.D., of Sterling Medical Associates.  She treated Plaintiff from 2007 through June 2010.  (R. at 278 – 301, 358 – 62).  Following Plaintiff's car accident, Dr. Nisenbaum observed Plaintiff to experience symptoms of PTSD, anxiety, cervical strain, shoulder pain, and lumbosacral strain.  (R. at 278 – 301, 358 – 62).  Her physical pain was noted to improve over time.  (R. at 278 – 301, 358 – 62).  Plaintiff also sought care from a chiropractor during this treatment period.  (R. at 278 – 301, 358 – 62).  Dr. Nisenbaum provided Plaintiff with prescription medication for relief.  (R. at 278 – 301, 358 – 62).  Plaintiff's mood stabilized with her medication.  (R. at 278 – 301, 358 – 62).

Plaintiff began physical therapy at Keystone Rehabilitation Systems ("Keystone") on March 20, 2008.  (R. at 241 – 42).  Plaintiff reported that she had experienced a slight concussion as a result of the automobile accident, that she suffered from headache pain every day, and that she was having difficulty sleeping.  (R. at 241).  Plaintiff was noted to be taking prescription pain medication.  (R. at 241).  She claimed to have difficulty performing activities of daily living, including lifting.  (R. at 241).  Upon physical inspection, it was noted that Plaintiff had a stiff neck and muscle spasm throughout her cervical spine, right upper trapezius intrascapule, and lower trapezius.  (R. at 241).  There was significant tenderness with gentle touch.  (R. at 241).  Plaintiff's prognosis was "good" with therapy.  (R. at 242).

Over the next several weeks of treatment at Keystone, it was noted that Plaintiff made progress with her symptoms.  (R. at 244 – 52).  Mild headache, muscle spasm, and some stiffness were noted.  (R. at 244 – 52).  By April 3, 2008, Plaintiff reported feeling "much better."  (R. at 247).  On April 23, 2008, after ten physical therapy sessions at Keystone, Plaintiff was noted to

have experienced a sixty percent decrease in spasm in her trapezius muscles, and an eighty percent reduction of spasm in her neck. (R. at 253). Her cervical range of motion and upper extremity range of motion were within normal limits. (R. at 253). Plaintiff's pain was "not near as bad as it was," although it worsened with stress, and Plaintiff complained of difficulty lifting grocery bags. (R. at 253).

Plaintiff continued to make progress in physical therapy, and was advised to be "more active." (R. at 254). Her cervical range of motion was within normal limits. (R. at 254). Mild stiffness and pain were still noted. (R. at 254 – 58). A progress note on May 13, 2008 indicated that Plaintiff experienced crepitus in her shoulders and mild pain. (R. at 259). Her cervical range of motion was normal and "pain free." (R. at 259). Further testing was recommended for Plaintiff's shoulders. (R. at 259). Plaintiff was last treated at Keystone on May 16, 2008. (R. at 262). A trigger point was present in her left upper trapezius muscle, but her shoulder range of motion was within normal limits, with some discomfort. (R. at 262).

At the urging of her primary care physician, Plaintiff began individual therapy at UPMC Western Psychiatric Institute and Clinic in Pittsburgh, Pennsylvania on May 15, 2008. (R. at 277). Plaintiff was treated by Luisa Bonavita, M.S.W. (R. at 277). Plaintiff informed Ms. Bonavita that she had been in a car accident that had left her in physical pain, and allegedly rendered her unable to work. (R. at 277). She also claimed to experience depression, anxiety, and PTSD, and reported taking Celexa and Wellbutrin for these issues. (R. at 277). Plaintiff stated that her sleep was normal, but that she suffered from excessive worry, anxiety, low mood, lack of motivation, and apathy. (R. at 277).

In subsequent therapy sessions with Ms. Bonavita, Plaintiff explained that her mental state was negatively impacted by her physical pain and limitation, as well as ongoing issues with

her current boyfriend, the father of her daughter, finances, and conflicts within her family.  (R. at 273 – 76).  By July 1, 2008, Plaintiff reported improvement in her mood, particularly with respect to her interpersonal relationships.  (R. at 273).  She was planning on taking a trip to Florida with her boyfriend for two weeks.  (R. at 273).  Following her trip to Florida, Plaintiff informed Ms. Bonavita that she continued to experience improving mood, but that continuing physical pain and family conflicts exacerbated her symptoms.  (R. at 272).

Plaintiff did not attend therapy between July 30, 2008 and September 25, 2008.  (R. at 271).  Plaintiff stated that she was applying for disability benefits.  (R. at 271).  Ms. Bonavita advised Plaintiff that her lack of structure and meaningful daily activity was inhibiting her psychological improvement.  (R. at 271).  Plaintiff was encouraged to engage in occupational and vocational rehabilitation.  (R. at 271).  Plaintiff's family issues were considered to be her psychosocial stressors.  (R. at 271).

Plaintiff continued seeing Ms. Bonavita through November 13, 2008.  (R. at 265 – 67).  Improvement in Plaintiff's insight, mood, and functioning were noted.  (R. at 265 – 67).  Plaintiff expressed an interest in returning to work if her physical pain permitted.  (R. at 265 – 67).  Plaintiff's depression was mild.  (R. at 265 – 67).

Psychiatrist Roger Haskett, M.D., also of UPMC Western Psychiatric Institute, completed an evaluation of Plaintiff's medication management on October 1, 2008.  (R. at 268 – 70).  He recorded that Plaintiff complained of increased anxiety, tearfulness, frustration, urges to self-injure, some suicidal ideation without intent, irritability with anger outbursts, decreased sleep, and emotional instability.  (R. at 268).  Plaintiff stated that she was able to control her irritability in public, and that her concentration was fair.  (R. at 268).  Plaintiff had only been

taking half of one tablet of Celexa for the previous two months, despite being prescribed two tablets of Wellbutrin and one tablet of Celexa, daily. (R. at 268).

Dr. Haskett observed Plaintiff to be alert, cooperative, and clean. (R. at 269). Her speech was within normal limits, her thoughts were logical and linear, and her insight and judgment were good. (R. at 269). However, Dr. Haskett found that Plaintiff exhibited moderately impaired cognitive function, constricted affect, and anxious mood. (R. at 269). She was diagnosed with recurrent, mild major depressive disorder, and panic disorder without agoraphobia. (R. at 269). Plaintiff was assigned a global assessment of functioning ("GAF") score of 60[2]. (R. at 270). She agreed to take the prescribed dosages of her medications. (R. at 270).

Beginning in September 2010, Plaintiff was followed by another primary care physician at Sterling Medical Associates, Nita Rai-Gohel, M.D. (R. at 363). Dr. Rai-Gohel noted Plaintiff's history of pain following her car accident, as well as Plaintiff's psychological issues. (R. at 363). On physical examination, Plaintiff demonstrated no headache, numbness, tingling, extremity weakness, abnormal balance or gait, back pain, joint pain, muscle achiness, or stiffness. (R. at 363). Plaintiff had a full range of movement in her neck, but tenderness was noted there, as well as over the trapezius muscles. (R. at 364). Plaintiff had no sensory deficits, and had a normal musculoskeletal examination. (R. at 364). Plaintiff was diagnosed with cervical radiculagia with myofascial pain syndrome. (R. at 364). Plaintiff was referred by Dr. Rai-Gohel to the Institute for Pain Medicine at West Penn Hospital for further pain treatment.

---

[2]     The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 51 – 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning." *Id.*

(R. at 364).  Dr. Rai-Gohel continued to treat Plaintiff through October 2010.  (R. at 363 – 68).

Plaintiff continued to complain of pain, despite her treatment at a pain clinic.  (R. at 363 – 68).

Plaintiff was evaluated by pain management specialist Todd A. Pepper, D.O., at the Institute for Pain Medicine on October 11, 2010.  (R. at 333 – 35).  At the initial evaluation, Plaintiff described her pain as 6 out of 10, on average.  (R. at 333).  It was worst in her neck, and sometimes radiated into her right arm.  (R. at 333).  The pain could be aching, stabbing, or shooting in nature, and was exacerbated by standing, walking, exercise, climbing stairs, pushing and pulling, and changes in weather.  (R. at 333).  Plaintiff indicated that sitting and medication relieved her pain.  (R. at 333).  She alleged that physical therapy had made her pain worse, in the past.  (R. at 333).  She used a TENS unit, which occasionally provided relief.  (R. at 333).

Upon examination, Dr. Pepper observed no pain behavior.  (R. at 334).  Plaintiff had full strength in her upper and lower extremities and grossly intact sensation.  (R. at 334).  Plaintiff was able to arise from a seated position without difficulty, and her gait was unremarkable.  (R. at 334).  There was cervical tenderness with palpation, and some limitation of motion due to pain.  (R. at 334).  Trigger points were identified in the right trapezius muscle.  (R. at 334).  Dr. Pepper did not witness any symptom magnification.  (R. at 334).

Plaintiff was diagnosed with myofascial pain, cervical pain, and right upper extremity radicular nondermatomal symptoms.  (R. at 334).  Dr. Pepper noted that Plaintiff's past treatment included only low-dose prescription medications for pain relief.  (R. at 334).  Dr. Pepper recommended an increase in prescription medication, physical therapy, and trigger point injections.  (R. at 335).  Plaintiff was also advised to engage in counseling, because her psychological issues could have been complicating her pain issues.  (R. at 335).

On October 18, 2010, Plaintiff returned to Dr. Pepper for trigger point injections. (R. at 336). Plaintiff had not been taking all of her prescribed medication, because it allegedly made her ill. (R. at 336). She had been using her TENS unit intermittently. (R. at 336). Dr. Pepper observed Plaintiff to be seated in no acute distress, but communicated extreme pain with very light palpation of the right cervical area. (R. at 336). Plaintiff had no difficulty rising from a seated position. (R. at 336). Plaintiff's strength and sensation in her extremities were intact. (R. at 336). She requested that Dr. Pepper stop his physical examination because of pain, however. (R. at 336). Plaintiff's diagnoses remained the same. (R. at 336). Trigger point injections were not attempted because of Plaintiff's expressed pain, and her prescription medications were altered. (R. at 337). On November 2, 2010, Dr. Pepper administered trigger point injections. (R. at 338).

Plaintiff had been scheduled to receive additional trigger point injections on November 10, 2010. (R. at 340). She declined the additional injections because her pain had been effectively decreased and she did not believe that additional injections were necessary. (R. at 340). Plaintiff continued to complain of side effects from her medications. (R. at 340). Her diagnoses remained the same, but Dr. Pepper opined that Plaintiff was experiencing "excellent pain benefit" from her trigger point injections. (R. at 340). Plaintiff was advised to continue taking her prescription medications, use her TENS unit, and engage in physical therapy. (R. at 341). She would return in several weeks to determine if further injections were needed. (R. at 341).

On December 13, 2010, Plaintiff returned for a follow-up with Dr. Pepper. (R. at 344). Her diagnoses remained the same, as did her strength and sensation. (R. at 344). She was still enjoying significant pain relief, but complained of an increase in muscle stiffness. (R. at 344).

Plaintiff's medications were adjusted, because she complained of side effects which disrupted her activities of daily living. (R. at 345). Plaintiff was still considered to be receiving "excellent benefit" from her trigger point injections. (R. at 344).

Plaintiff was last seen by Dr. Pepper on January 1, 2011. (R. at 437 – 38). At that time, Plaintiff stated that her pain was "not too bad." (R. at 437). She rated it as 4/10. (R. at 437). Her diagnoses remained the same. (R. at 437). Further trigger point injections were postponed due to the mild nature of Plaintiff's pain. (R. at 437). Dr. Pepper indicated that Plaintiff had experienced "excellent benefit" from the injections. (R. at 437). Plaintiff was to follow up with Dr. Pepper in two months. (R. at 438).

While under Dr. Pepper's care, Plaintiff had also been attending physical therapy at NovaCare Rehabilitation in Pittsburgh, Pennsylvania. (R. at 342 – 43, 346 – 57, 369 – 436). At her initial evaluation in October 2010, Plaintiff was noted to be independent without difficulty in terms of personal care, but was unable to work. (R. at 342). She complained of headache pain, as well as neck and back pain. (R. at 342). Plaintiff reported that her TENS unit was not totally effective, and could occasionally increase her pain. (R. at 346). Over the course of therapy, Plaintiff's pain was noted to be decreasing, and her functional capacity was improving. (R. at 347, 356). She was typically noted to complete treatment with few or no complaints of pain or difficulty. (R. at 342 – 43, 346 – 57, 369 – 436). Plaintiff's range of motion and mobility were within normal limits by November 2012. (R. at 356). By December 2012, Plaintiff was considered to have met her treatment goals. (R. at 353). No further skilled intervention was believed to be necessary for Plaintiff's physical conditions, and she was discharged. (R. at 354).

### 4. Functional Capacity Assessments

On April 4, 2009, Laure A. Swearingen, Ph.D. performed a mental status examination of Plaintiff on behalf of the Bureau of Disability Determination.  (R. at 302 – 10).  Dr. Swearingen noted that Plaintiff had ceased receiving psychological and psychiatric treatment in December 2008 after UPMC closed the program that was providing her care.  (R. at 302).  Since that time, her primary care physician had been prescribing Wellbutrin for treatment.  (R. at 302).  Plaintiff complained of fluctuating moods and depression since her car accident.  (R. at 302).  She claimed that her cognitive functioning – including memory and concentration – had declined, possibly due to a concussion suffered in her accident.  (R. at 302).  She stopped taking prescribed Celexa because she believed that it made her more aggressive and irritable.  (R. at 303).  She did not feel in control of her life.  (R. at 303).  She complained of persistent pain in her neck, right shoulder, and back.  (R. at 303).

Plaintiff explained to Dr. Swearingen that she had a difficult childhood wrought with mental health issues, she became pregnant at an early age, and she had to leave college to take care of a younger sibling.  (R. at 304 – 305).  She claimed that her car accident left her with a "bad concussion," and that she experienced difficulty with speaking.  (R. at 304).  She told Dr. Swearingen that the car accident had been a side-impact collision.  (R. at 305).  Following the accident, she was diagnosed with PTSD, and was allegedly prone to panic attacks.  (R. at 304).

Dr. Swearingen observed Plaintiff to be neatly dressed and well-groomed.  (R. at 306).  However, she was fidgety and ill at ease.  (R. at 306).  She was sad, anxious, and depressed.  (R. at 307).  Plaintiff's speech was flat, but rapid and of moderate volume.  (R. at 307).  Plaintiff appeared to enjoy talking.  (R. at 307).  Plaintiff displayed adequate concentration and focus, and remained in control of her emotion expression, except when she was in physical pain.  (R. at

307).  She did not appear to be distracted or preoccupied.  (R. at 307).  Plaintiff exhibited no delusions or paranoia, and her thoughts were coherent, organized, and logical.  (R. at 308).  Plaintiff's insight was moderate, and her intelligence appeared to be "at least average."  (R. at 308).  During the evaluation, Dr. Swearingen administered a cognitive test, and recorded average results with no indication of cognitive impairment.  (R. at 306).  Plaintiff received a perfect score for attention, and near perfect score for memory.  (R. at 307).  She approached tasks "economically and efficiently."  (R. at 308).

Dr. Swearingen diagnosed Plaintiff with recurrent, severe major depressive disorder without psychotic features, and anxiety disorder, NOS.  (R. at 308 – 09).  Plaintiff's GAF score was 43[3].  (R. at 309).  Dr. Swearingen opined that as a result of these impairments, Plaintiff would experience marked restriction understanding, remembering, and carrying out detailed instructions, and responding appropriately to changes in the work setting, and extreme limitation responding appropriately to work pressures.  (R. at 309).

On May 5, 2009, state agency evaluator Lisa Cannon, Psy.D. completed a Mental Residual Functional Capacity Assessment ("RFC") of Plaintiff.  (R. at 311 – 14).  Based upon her review of the medical record, Dr. Cannon believed that the evidence supported finding impairments of affective disorders and anxiety-related disorders.  (R. at 311).  Dr. Cannon concluded that Plaintiff had moderate limitations in three of four assessed functions.  First, she found Plaintiff limited in "sustained concentration and persistence."  Specifically, she found Plaintiff moderately limited in the ability to carry out detailed instructions, to maintain attention and concentration for extended periods of time, to perform activities within a schedule, and to

---

[3]        An individual with a GAF score of 41 – 50 may have "[s]erious symptoms (e.g., suicidal ideation …)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000).

complete a normal work day and workweek without interruption from psychologically based symptoms. (R. at 311 – 12). Second, Dr. Cannon found Plaintiff had moderate limitations in social interaction. Specifically, she found Plaintiff moderately limited in the ability to accept instruction and respond appropriately to criticism from supervisors. (R. at 312). Third, Dr. Cannon found Plaintiff had moderate limitation in the ability to respond to changes in the work setting. (R. at 312). Based upon this assessment, Dr. Cannon opined that Plaintiff was only capable of work involving simple decisions and very short and simple instructions. (R. at 313). Dr. Cannon considered Dr. Swearingen's assessment to be an overestimate of the severity of Plaintiff's functional limitations. Because Dr. Cannon found Dr. Swearingen's findings to contain inconsistencies with the objective medical record, Dr. Cannon accorded Dr. Swearingen's findings limited weight. (R. at 313).

On January 21, 2011, Dr. Rai-Gohel, Plaintiff's primary care physician, completed a physical functional capacity assessment of Plaintiff. (R. at 329 – 31). Dr. Rai-Gohel opined that Plaintiff suffered from severe myofascial pain, PTSD, and concussion-related complications. (R. at 329 – 31). As a result, Plaintiff was expected to be able to stand and walk no more than one hour of an eight hour work day, and sit no more than three hours. (R. at 329). Plaintiff could not lift anything. (R. at 329). She could do no repetitive pushing and pulling, and she could not operate foot controls repetitively. (R. at 330). Plaintiff had no ability to bend, squat, crawl, or climb. (R. at 330). It was Dr. Rai-Gohel's opinion that Plaintiff could not work a full-time job. (R. at 330). She was projected to miss more than fifteen days of work per month, if working. (R. at 330).

On March 15, 2011, S. Sandra Singh, Ph.D., a clinical psychologist and therapist, completed a mental status questionnaire relative to Plaintiff. (R. at 454 – 56). Dr. Singh had

treated Plaintiff on three occasions prior to the completion of the questionnaire; however, no treatment notes were provided as part of the record.  (R. at 42).  Dr. Singh diagnosed Plaintiff with PTSD following her car accident.  (R. at 454).  As a result, Plaintiff experienced intense flashbacks, inability to drive, and agitation.  (R. at 454).  Plaintiff's psychological status was negatively affected by her physical pain, as well.  (R. at 454).  Dr. Singh opined that Plaintiff would experience marked limitation with concentration, persistence, and pace.  (R. at 455).  She also determined that Plaintiff suffered moderate impairment in performing the activities of daily life and moderate limitations in the ability to function in a work setting.  (R. at 455).  Dr. Singh opined that a "low stress job" would be preferable for Plaintiff, in light of her irritability and desire to withdraw from others.  (R. at 456).  Dr. Singh also opined that the accumulated stress of ongoing employment could cause Plaintiff's functional capacity to further deteriorate.  (R. at 456).  If Plaintiff obtained full-time work, Dr. Singh projected that it would adversely impact Plaintiff's level of functionality.  Dr. Singh projected that Plaintiff would miss four to seven days of work per month.  (R. at 456).

### 5. Administrative Hearing

Plaintiff testified that she had been incapable of sustaining work since her car accident on May 7, 2008.  (R. at 35 – 36).  Prior to the accident, she managed to attend school and engaged in full-time work at a minimum-wage level, while raising her daughter.  (R. at 36 – 37).  Plaintiff stated that the primary barrier to a return to the workforce was her physical pain.  (R. at 37).  The pain vacillated from dull and achy, to stabbing.  (R. at 37).  It was mainly located on the right side of her neck, her right shoulder, and her lower back.  (R. at 37).  The pain often woke Plaintiff from sleep.  (R. at 41).  Plaintiff had engaged in multiple stints of physical therapy, and utilized long-term medication management, trigger point injections, and a TENS unit, in an

attempt to control her pain. (R. at 38 – 39). She claimed to have experienced only temporary relief, and also stated that her medications had significant side effects. (R. at 38 – 39).

Plaintiff also endorsed experiencing depression and PTSD. (R. at 37). Plaintiff described becoming easily distracted, and claimed to have difficulty with focus and concentration. (R. at 42). She did not handle stress well, and often became agitated. (R. at 42). Plaintiff's patience was minimal, and she was angered and frustrated easily. (R. at 42).

Plaintiff explained that a typical day involved waking in the morning, getting her daughter ready for school, attempting to do chores, and otherwise trying to control her pain. (R. at 40). She would lie down or soak in the bathtub for relief. (R. at 40). She relied upon her boyfriend to help with household chores and grocery shopping. (R. at 41). If she had a good day, she would attempt to take her daughter out to do activities such as visiting museums. (R. at 41).

Following Plaintiff's testimony, the vocational expert testified briefly. (R. at 43 – 46). The ALJ asked the vocational expert whether a hypothetical person of Plaintiff's age, educational, work experience and functional capacity, as testified to by Plaintiff, would be eligible for jobs in the national economy if limited to light duty/ light exertional, low-stress work. (R. at 44). The vocational expert responded that such a person would be capable of working as a "garment bagger," with 500,000 positions available in the national economy, as a "sorter," with 300,000 positions available, and as a "laundry folder," with 100,000 positions available. (R. at 44 – 45). Further, the vocational expert testified that the hypothetical person could miss no more than a half day or one full day of work per month, and that any greater absence would eliminate the identified positions. (R. at 45).

**B.**    **ANALYSIS**

**1. Standard of Review**

To be eligible for Social Security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F. 2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24 – 25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F. 2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues.  42 U.S.C. §§ 405(g)[4], 1383(c)(3)[5]; *Schaudeck v. Comm'r of Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999).  Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole.  *See* 5 U.S.C. §706.  The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact.  *Burns v. Barnhart,* 312 F. 3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion.  *Ventura v. Shalala*, 55 F. 3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)).  If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive.  42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390.  When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered.  *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947).  The

[4]         Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[5]         Section 1383(c)(3) provides in pertinent part:
> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F. 2d 1185, 1190 – 91 (3d. Cir. 1986).

**2. Discussion**

Based upon the medical record in this case, the ALJ determined that Plaintiff suffered the following severe impairments: chronic neck and shoulder pain/myofascial pain syndrome, depression, and PTSD secondary to a motor vehicle accident. (R. at 14). As a result of said impairments, the ALJ found that Plaintiff was only capable of performing light work in a low stress work environment. (R. at 19). Based upon the testimony of the vocational expert, the ALJ concluded that even with said limitations, there are a significant number of jobs in existence in the national economy that Plaintiff can perform. (R. at 25 – 26). As a result, the ALJ issued a decision denying Plaintiff DIB and SSI. (R. at 26 – 27).

Plaintiff objects to this decision by the ALJ, arguing that he committed error by failing to accommodate all of Plaintiff's established mental and physical limitations in his RFC assessment and hypothetical question, and by failing to give full credit to the functional capacity findings of Plaintiff's treating sources. (ECF Nos. 12 at 5 – 16; 15 at 2 – 7). Defendant counters that the ALJ adequately supported his decision with substantial evidence from the record, and should be affirmed. (ECF No. 14 at 14 – 21). The Court agrees with Plaintiff, in part.

Plaintiff first argues that the ALJ expressly found in his decision that Plaintiff was incapable of following more than short, simple instructions; however, this finding was not

included in the ALJ's RFC assessment or hypothetical question. (ECF No. 12 at 6). Defendant asserts that the finding did not need to be explicitly included, because the skill levels of the jobs for which Plaintiff qualified anticipated the ability to follow short, simple instructions. (ECF No. 14 at 14 – 15). In his testimony, the vocational expert provided that the job of "garment bagger" had a specific vocational preparation ("SVP") classification of 1, and the other two jobs had SVP's of 2. (R. at 44).

The United States Court of Appeals for the Third Circuit has held that "great specificity" is required of an ALJ when formulating the physical and mental limitations within an RFC and hypothetical question. *Ramirez v. Barnhart*, 372 F. 3d 546, 554 – 55 (3d Cir. 2004) (citing *Burns v. Barnhart*, 312 F. 3d 113, 122 (3d Cir. 2002)). Credibly established limitations must be included in the RFC and hypothetical question, and limitations which are "medically supported and otherwise uncontroverted in the record, but that are not included in the hypothetical question posed to the expert, preclude reliance on the expert's response." *Rutherford v. Barnhart*, 399 F. 3d 546, 554 (3d Cir. 2005) (citing *Plummer v. Apfel*, 186 F. 3d 422, 431 (3d Cir. 1999)).

Defendant does not contest that a credibly established limitation was omitted by the ALJ. Instead, Defendant relies upon Social Security Ruling ("S.S.R.") 00-4p, together with S.S.R. 85-15, indicating that unskilled work corresponds to an SVP of 1 – 2, and that the basic mental demands of unskilled work include the ability to understand, remember, and carry out simple instructions. S.S.R. 00-4p at *3; S.S.R. 85-15 at *4. Defendant proposes that the limitation of the ability to only follow very short and simple instructions is implicitly accommodated by the jobs offered by the vocational expert, and reliance upon his testimony was not improper.

However, the holding in S.S.R. 85-15 that the "basic mental demands" of unskilled work includes the ability to "understand, carry out, and remember simple instructions" is not an

outright statement that no job at the SVP 1 or 2 level could require more.  Generally, "''residual functional capacity'[RFC] is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'"  *Burnett v. Comm'r of Soc. Sec.*, 220 F. 3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F. 3d 358, 359 n. 1 (3d Cir. 1999)).  A claimant's RFC represents the most, not the least, which a person can do despite his or her limitations.  *See Cooper v. Barnhart*, 2008 WL 2433194, at *2 n. 4 (E.D. Pa. June 12, 2008) (citing 20 C.F.R. § 416.945(a)); S.S.R. 96-8P at *1 – 2.

It is undisputed that Dr. Cannon concluded that Plaintiff was moderately limited in sustained concentration and persistence including the ability to: carry out detailed instructions, maintain attention and concentration for extended periods of time, perform activities within a schedule, and complete a work day without interruptions from psychologically based symptoms. (R. at 311 – 12).  It is also undisputed that Dr. Cannon found that Plaintiff only had the ability to handle very short and simple instructions.

A review of the ALJ's decision clearly reveals that he did not include in his hypothetical question to the vocational expert the significant functional limitation that Plaintiff only had the ability to handle very short and simple instructions.  (R. at 313).  Moreover, the ALJ did not include the more detailed "sustained concentration and persistence" functional capacity limitations identified by the state agency evaluator.  (R. at  311 – 12).  Without the inclusion of these significant functional limitations, it does not appear that the vocational expert's testimony adequately accounted for Plaintiff's mental limitations.  As such, it cannot be relied upon as substantial evidence of Plaintiff's ability to work.  Accordingly, remand is required.

Plaintiff next argues that the ALJ erred in failing to find limitations beyond Plaintiff's restriction to low stress work, as reflected in the findings of Drs. Singh, Swearingen, and

Cannon.  (ECF No. 12 at 7 – 12).  Defendant answers that the more severe findings of Drs. Singh and Swearingen were not corroborated by the objective medical record, that the ALJ properly relied upon the findings of the state agency evaluator as a partial basis for rejection of the findings, and that Dr. Cannon's findings were adequately accommodated.  (ECF No. 14 at 15 – 18).  It is the long-established law of this Circuit that a treating physician's opinions may be entitled to great weight – considered conclusive unless directly contradicted by evidence in a claimant's medical record – particularly where the physician's findings are based upon "continuing observation of the patient's condition over a prolonged period of time." *Brownawell v. Comm'r of Soc. Sec.*, 554 F. 3d 352, 355 (3d Cir. 2008) (quoting *Morales v. Apfel*, 225 F. 3d 310, 317 (3d Cir. 2000)); *Plummer v. Apfel*, 186 F. 3d 422, 429 (3d Cir. 1999) (citing *Rocco v. Heckler* 826 F. 2d 1348, 1350 (3d Cir. 1987)).

However, "the opinion of a treating physician does not bind the ALJ on the issue of functional capacity." *Chandler v. Comm'r of Soc. Sec.*, 667 F. 3d 356, 361 (quoting *Brown v. Astrue*, 649 F. 3d 193, 197 n. 2 (3d Cir. 2011)).  A showing of contradictory evidence and an accompanying explanation will allow an ALJ to reject a treating physician's opinion outright, or accord it less weight. *Brownawell*, 554 F. 3d at 355.  Moreover, a medical opinion is not entitled to any weight if unsupported by objective evidence in the medical record. *Plummer*, 186 F. 3d at 430 (citing *Jones v. Sullivan*, 954 F. 2d 125, 129 (3d Cir. 1991)).  Additionally, the determination of disabled status for purposes of receiving benefits – a decision reserved for the Commissioner, only – will not be affected by a medical source simply because it states that a claimant is disabled or unable to work.  20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2).

Dr. Singh's medical opinion included findings that Plaintiff would experience marked limitation with concentration, persistence, and pace, that the accumulated stress of ongoing

employment could cause Plaintiff's functional capacity to worsen, and that Plaintiff would likely miss four to seven days of work per month. (R. at 455 – 56). As noted by the ALJ, Dr. Singh did not have a substantial treating relationship with Plaintiff, and there was no objective evidence to prove that she had seen Plaintiff on three prior occasions, as alleged. (R. at 18). The ALJ felt that his provision of a limitation for low stress work adequately accommodated Dr. Singh's concerns over Plaintiff's difficulty with stressful situations. (R. at 18). The ALJ considered Dr. Singh's other opinion regarding Plaintiff's concentration, persistence, and pace to have little value due to Plaintiff's short, inconsistent mental health treatment history, past objective testing which indicated that Plaintiff had adequate concentration and focus, the relatively mild notes from treatment with Ms. Bonavita, and the less restrictive RFC assessment by Dr. Cannon. (R. at 16 – 25). In light of the ALJ's thorough discussion of the objective treatment record, the Court will not disturb the ALJ's findings with respect to the opinion of Dr. Singh.

Next, Dr. Swearingen, a consulting medical professional for the Bureau of Disability Determination Services, made findings that Plaintiff would experience marked restriction understanding, remembering, and carrying out detailed instructions, and responding appropriately to changes in the work setting, and extreme limitation responding appropriately to work pressures. (R. at 309). She further assigned a GAF score of 43. (R. at 309). The ALJ discounted Dr. Swearingen's opinion for a number of reasons. First, the objective cognitive test administered by Dr. Swearingen did not indicate severe limitations. (R. at 16). Second, Dr. Swearingen's assessment stood in marked contrast to that of Dr. Haskett, Plaintiff's treating psychiatrist, whose findings indicated that Plaintiff's depression was mild, and her GAF score was 60. (R. at 16 – 18). The findings were also inconsistent with the milder findings within Ms. Bonavita's treatment notes, and the RFC assessment completed by Dr. Cannon. (R. at 16 – 18).

Plaintiff was also noted to have a less than optimal history of compliance, and that when on her medications and when attending therapy regularly, she experienced significant improvement. (R. at 16 – 18). Similarly to Dr. Singh, based upon the discussion of the objective record by the ALJ, the Court finds that the rejection of the more severe findings of Dr. Swearingen was supported by substantial evidence.

Regardless, the findings of Dr. Cannon, the state agency evaluator, were not adequately accommodated and require remand. Among other moderate limitations findings, Dr. Cannon noted that Plaintiff would have difficulty in carrying out detailed instructions and in maintaining attention and concentration. (R. at 311). Additionally, Dr. Cannon found that Plaintiff was moderately limited in the ability to accept instructions and respond appropriately. (R. at 312). Dr. Cannon limited Plaintiff to jobs involving only "very short and simple instructions." (R. at 311). The ALJ's RFC and hypothetical question did not account for such findings, and the limitation to a "low stress work environment" is hardly an accommodation for deficits in attention, sustained concentration, and the ability to follow and carry out instruction, as well as accept instruction. Remand is, therefore, required for further consideration of Dr. Cannon's findings.

Lastly, Plaintiff attacks the ALJ's failure to include physical limitations in his RFC assessment – particularly those of Plaintiff's primary care physician, Dr. Rai-Gohel. (ECF No. 12 at 12 – 16). Defendant argues that the limitation to light work – which entails lifting no more than twenty pounds occasionally and ten pounds frequently, standing and walking no more than six hours of an eight hour work day, and sitting for up to two hours – adequately accommodated Plaintiff's credible physical limitations. (ECF No. 14 at 18 – 21). Dr. Rai-Gohel opined that Plaintiff suffered from severe myofascial pain, PTSD, and concussion-related complications. (R.

at 329 – 31).  As a result, Plaintiff was expected to be able to stand and walk no more than one hour of an eight hour work day, and sit no more than three hours.  (R. at 329).  Plaintiff could not lift anything.  (R. at 329).  She could do no repetitive pushing and pulling, and she could not operate foot controls repetitively.  (R. at 330).  Plaintiff had no ability to bend, squat, crawl, or climb.  (R. at 330).   It was Dr. Rai-Gohel's opinion that Plaintiff could not work a full-time job.  (R. at 330).  She was projected to miss more than fifteen days of work per month, if working.  (R. at 330).

The ALJ discounted the value of this assessment, stating that there was no objective evidence that Plaintiff had suffered a concussion, Plaintiff did not consistently take pain medications for significant periods of time, Dr. Pepper indicated that Plaintiff saw exceptional improvement in pain with trigger point injections, and Plaintiff successfully completed a course of physical therapy during which she met all of her treatment goals and no longer required skilled intervention.  (R. at 22 – 24).  The objective medical record indicated that Plaintiff had a range of motion within normal limits and had full strength in her extremities.  (R. at 22 – 24).  Based upon the ALJ's thorough discussion of Plaintiff's physical treatment history, the Court can conclude that while Plaintiff suffers physical limitation, substantial evidence supported the ALJ's assertion that it was clearly not as severe as projected by Dr. Rai-Gohel.

## C.   CONCLUSION

Based upon the foregoing, the ALJ failed to provide substantial evidence to justify his decision as it pertained to the formulation of his RFC assessment and hypothetical to the vocational expert.   Accordingly, it is respectfully recommended that Plaintiff's Motion for Summary Judgment (ECF No. 11) be granted, to the extent remand for reconsideration is sought, and denied, to the extent reversal and an immediate award of benefits is sought.   It is further

recommended that Defendant's Motion for Summary Judgment (ECF No. 13) be denied, and the decision of the ALJ be vacated and remanded for further thorough consideration consistent with this Report and Recommendation.

"On remand, the ALJ shall fully develop the record and explain [his or her] findings… to ensure that the parties have an opportunity to be heard on the remanded issues and prevent *post hoc* rationalization" by the ALJ. *Thomas v. Comm'r of Soc. Sec.*, 625 F. 3d 798, 800 – 01 (3d Cir. 2010). *See also Ambrosini v. Astrue*, 727 F. Supp. 2d 414, 432 (W.D. Pa. 2010). This includes more thoroughly addressing all of the limitations identified by Dr. Cannon, and discussed by this Court, and adding a limitation to "very short and simple instructions" to a hypothetical to a vocational expert. Additionally, Plaintiff should be permitted input via submissions to the ALJ. *Id.* at 801 n. 2.

In accordance with the Magistrate Judges Act, 28 U.S.C. 636(b)(1)(B) and (C), and Rule 72.D.2 of the Local Rules of Court, the parties are allowed fourteen (14) days from the date of service of a copy of this Report and Recommendation to file objections. Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto. Failure to file timely objections will constitute a waiver of any appellate rights.

*s/ Maureen P. Kelly*
MAUREEN P. KELLY
UNITED STATES MAGISTRATE JUDGE


Dated: October 1, 2013
cc/ecf: All counsel of record.